**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**LAVAR DAVIS, 97-A-4572,**

                                        **Plaintiff,**                    **11-CV-431(Sr)**

**v.**

**C.O. JASON RYNKEWICZ,**
**CAPTAIN STEVEN CASACELI,**
**SGT. ANTHONY THERIAULT,**
**S. FURLANI,**
**D.S.S. THOMAS STICHT,[1] and**
**DIR. OF S.H.U. ALBERT PRACK,**

                                        **Defendants.**

---

## DECISION AND ORDER

          Pursuant to 28 U.S.C. § 636(c), the parties have consented to the

assignment of this case to the undersigned to conduct all further proceedings, including

the entry of final judgment.  Dkt. #32.


          Plaintiff commenced this action, *pro se*, pursuant to 42 U.S.C. § 1983,

alleging that his constitutional rights were violated during his incarceration at the Wende

Correctional Facility ("Wende").  Dkt. #1.  Specifically, plaintiff alleges that: (1)

Education Supervisor Furlani denied plaintiff due process during the course of multiple

disciplinary hearings; (2) Special Housing Unit ("SHU"), Director Prack failed to modify

plaintiff's disciplinary sentence; (3) Captain Casaceli denied plaintiff due process during

---

[1] Plaintiff withdrew his claims against Deputy Superintendent of Security ("DSS"), Sticht and the Court directed that he be terminated as a party to this action by Order entered  January 14, 2013.  Dkt. #19.

the course of a disciplinary hearing; (4) CO Rynkewicz issued six false misbehavior reports in retaliation for plaintiff exercising his right to file grievances and complain about staff misconduct; (5) CO Rynkewicz used excessive force upon plaintiff; (6) Sergeant Theriault subjected plaintiff to cruel and unusual punishment by allowing use of the retention strap without obtaining prior authorization and by imposing a cell shield and mechanical restraint order upon plaintiff; and (7) Sergeant Theriault and Captain Casaceli denied plaintiff the opportunity for meaningful exercise in violation of plaintiff's right to be free from cruel and unusual punishment.  Dkt. #1.

Currently before the Court is defendants' motion for partial summary judgment (Dkt. #41), and plaintiff's cross motion for summary judgment. Dkt. #46.  For the following reasons, defendants' motion is granted in part and plaintiff's motion is denied.

## FACTUAL BACKGROUND

### January 28, 2010 Misbehavior Report - Gangs

On January 28, 2010, following a company cell search, CO Littles issued a misbehavior report charging plaintiff with belonging to a gang; interference with an employee; contraband; altered item; creating a disturbance; and refusing a direct order. Dkt. #55-1, p.2.

At the disciplinary hearing conducted by Commissioner's Hearing Officer ("CHO"), Furlani on Feburary 3, 2010, plaintiff pled guilty to the charge of possession of

an altered item, but denied the remaining charges.  Dkt. #55-2, p.4.  Plaintiff requested

that his hearing assistant testify regarding her conversation with five inmate witnesses,

but CHO Furlani informed plaintiff that although he could call the inmate witnesses, he

would not allow the hearing assistant to testify as to her interviews of the inmate

witnesses. Dkt. #55-2, pp.5 & 40.  Plaintiff also requested testimony from the CO's

searching cells near plaintiff; a Rastafarian staff person to testify that the gang sign was

actually a religious symbol; and the author of the misbehavior report, CO Littles.  Dkt.

#55-2, pp.5-7.  CHO Furlani denied the request for a Rastafarian staff person,

explaining that the Rastafarian inmate coordinator was the Catholic Chaplain, who was

unlikely to be able to testify as to the religious significance, if any, of the hand gesture

displayed in the photograph.  Dkt. #55-2, p.7.


        Although plaintiff's hearing assistant allegedly identified one of the CO's

searching an adjoining cell as CO Grosekowsky, CHO Furlani determined that no such

officer was employed at Wende.  Dkt. #55-2, pp.7 & 10-11.  However, CHO Furlani

determined that CO Kyle was working during the company cell frisk and called him to

testify. Dkt. #55-2, p.7.  CO Kyle testified that inmates are allowed to observe the cell

frisk in the gun walk between the windows and cells so long as they are quiet and don't

create a disturbance or distract the CO's performing the cell searches.  Dkt. #55-2, p.8.

CO Kyle testified that he was searching either the cell next to plaintiff's cell or the cell

two cells from plaintiff's cell and heard plaintiff questioning what the officers were doing

in a loud tone that caused him to come out of the cell he was searching and escort

plaintiff off the company.  Dkt. #55-2, pp.9-11.  CHO Furlani advised plaintiff that CO

Moran was also working the company cell frisk, but plaintiff declined to call him as a witness.  Dkt. #55-2, pp.11 & 29.

CO Ferron testified that he is the On the Job Training Officer and was training CO Littles during the search of plaintiff's cell.  Dkt. #55-2, pp.12-13.  CO Ferron testified that the following items were discovered in plaintiff's cell: two hot pots which had been altered; a mess hall tin can and jumper wire which inmates are not permitted to possess in their cells; a beard trimmer for which plaintiff had not obtained a permit; a Polaroid of three inmates making an "O" with their hands, which CO Ferron testified stands for "outlaw gangsters," a sign associated with the "Bloods;" and a Polaroid with "Is there a Heaven for a G?" written on it. Dkt. #55-2, pp.13-16 & 21-22. CO Ferron testified that "G" is an abbreviation for gangsters.  Dkt. #55-2, p.22.  CO Ferron also found letters including the abbreviation, "GKB," which stands for "Gangster Killer Bloods," and discussion of war between the Hummers and Bentleys.  Dkt. #55-2, p.22. For example, one letter states:

> . . . I am sending this epistle your way today to inform you that you have a new addition to the family along with many other komrades [sic].  Let me introduce my self [sic] and [ ] you on some of my backround. [sic] I go by the handle of Reckless B. a.k.a. The Youngest in Charge.  I'm 18 yrs. old and I reside in "The Jungle" (BUSHWICK).  Im [sic] a Puerto Rican OLA who has been in the game since I was 12.  My 1st Hood I ever pushed was G-Shyne (GKB) under a fool named SHA-RED from the Stuy. I later got plugged in by a [ ] that goes by the name of INSANE B. I then through [sic] my hat on and pushed Hit Squad Brigade. I held the 1st floor to that hood at the age of 15 yrs old. My maturity was above avg. and the way I carried myself showed it all. I've been tested.  . . .

As for the "Hummer"! It wasn't moving well at all. Lack of leadership, communication and loyalty brung [sic] the hood down.  I was left with no choice but to keep my hat on tight and remain a HATBOY! At the time I was under I-BRIM AKA OUTLAW. The Active Manager to the town.  The unorganized hood drove me away.  I got plugged in with the Big Fool Relly B.  The Homie Superstar plugged me into the Bentley.  At the time it seemed like a good move.  It seemed organize. [sic] But what we didn't see was what was going on behind the wall.  I was given the responsibility of holding down the 2nd floor to the hood. It was wavy. Until we started getting the news about this whole mess.  To keep it official I'm tired of not having a stable, organized, and dedicated hood.  We have an Army ready to ride.  A [sic] army who is determined to progress.

* * *

My main purpose in this kite is to let you know that you have a [sic] Army willing to uplift this hood in many ways. As for . . . writing kites, and taking trips to see the homies, that is no problem.  After all communication is a must.  As for money being sent. [sic] We have kitties made specifically for the brothers who are incarcerated.

Dkt. #55-1, pp.6-7  Another letter states:

I currently sit in the Bentley under Relly.  I've read a few of your vibes elaborating on [sic] current situation with the Bentley and I agree it's crazy but by reading your vibes I see your [sic] very intellectual and respect your movement because you don't hear no negativity about the Range Rover. [sic] respect the militancy of that.  But more or less I was in lightened [sic] on the transaction to the Range Rover and was asked how I feel. I thought about it and told Relly I dig it.  So I'm happy to say I'll love to be a part of your Army.  I'm not a buster I'm more a silent thinker, express my opinion when needed. I bang when necessary, know how to be a Sergeant when my lieutenant is unable to be. [ ] no rat know how to take responsibility for my actions, know how to present leadership and show loyalty.  I [sic] only reason I will not remain loyal to the Bentley because its going to be one big war between Bentley's and I will not be a part of that.  But for the most part I love my hood.  I know you don't know me from a can of paint, but I admire the transaction for the up building of the Range. . . .

-5-

Dkt. #55-1, p.9.  CO Ferron testified that plaintiff became aggravated and aggressive as he and CO Littles began taking items out of his cell, questioning the authority for the search despite being told repeatedly that it was a company frisk and being warned that he would be removed if he didn't calm down.  Dkt. #55-2, pp.23-25.

Plaintiff renewed his request for a witness to explain that the "O" hand gesture depicted in the Polaroid was a religious, rather than a gang symbol.  Dkt. #55-2, p.21.  CHO Furlani reiterated that the Rastafarian inmate coordinator at Wende is a Catholic Chaplain who was unlikely to be able to testify regarding Rastafarian hand gestures.  Dkt. #55-2, p.21. Given the lack of a Rastafarian Chaplain, plaintiff requested a Rastafarian inmate to testify, but that request was denied.  Dkt. #55-2, p.52.  Plaintiff then asked for someone from Albany, but that request was also denied.  Dkt. #55-2, p.53.

Plaintiff also objected that he had requested CO Littles, not CO Ferron. Dkt. #55-2, p.29.  CHO Furlani explained that CO Littles was not currently working at Wende and that CO Ferron co-authored the misbehavior report wtih CO Littles, who was undergoing on the job training under CO Ferron's direct supervision at the time of the search.  Dkt. #55-2, p.29.

Plaintiff complained that he had not received a copy of the May 8, 2008 updated rules replacing Rule 105.12 (unauthorized organizations) with Rule 105.13 (gangs).  Dkt. #55-2, pp.31-32.  CHO Furlani observed during a break in the hearing

that the rule was posted in plaintiff's cell block and advised plaintiff that he was

responsible for following all posted rules.  Dkt. #55-2, pp.45-49 & 53. Plaintiff argued

that he should have received a copy of the updated rules.  Dkt. #55-1, p.49.


Plaintiff was removed from the hearing because he was disruptive.  Dkt.

#55-2, p.54.  In his absence, CHO Furlani found plaintiff guilty of all charges and

sentenced plaintiff to 12 months of SHU with loss of recreation, package, commissary,

phone and personal television privileges.  Dkt. #55-1.  In support of the disposition,

CHO Furlani relied upon the testimony of CO Kyle, who

> clearly stated that during the frisk of your cell he had heard
> you speak in a very loud tone which disturbed the cell
> search in progress and testified your actions violated Rule
> 104.13 and 107.10 Creating a Disturbance and Interference
> with Officer frisking your cell.  CO Ferron testified in detail
> how he found several hot pots in clear violation of Rule
> 113.11 Altered Item and thus they are considered
> contraband Rule 113.23.  CO Ferron's testimony . . . that . . .
> written letters and two pictures that were found in your cell
> clearly had gang related symbols and hand signs and words
> that indicated membership in the "Bloods" gang.  As this
> organization is unauthorized it is a clear violation of Rule
> 105.13 Gangs.  CO Ferron . . . stated your aggressive and
> loud tone disturbed the area.

Dkt. #55-2, p.54.  CHO Furlani noted numerous prior disciplinary violations, including 3

previous violations of Rule 105.12 (unauthorized organization), which had been

replaced by Rule 105.13 (gangs) in May of 2008.  Dkt. #55-2, p.54.


Plaintiff filed an administrative appeal, arguing that he had not been

provided notice of Rule 105.13 and that he was denied witnesses, including testimony

from his hearing assistant, a Rastafarian inmate, and CO Litttles.  Dkt. #42-3.  Director

of Special Housing/Inmate Disciplinary Program Norman Bezio affirmed the results of

the Superintendent's Hearing on April 7, 2010.  Dkt. #42-4.


On July 7, 2010, plaintiff wrote the Acting Director of Special

Housing/Inmate Disciplinary Program, Albert Prack, seeking reconsideration of his

sentence in accordance with a memorandum from Deputy Commissioner LeClaire

regarding Disposition Guidelines for Rule 105.13, which suggested that first offenders

receive 0-3 months in SHU.  Dkt. #50, p.6.  While acknowledging that he had previously

been found guilty of violating Rule 105.12, plaintiff argued that these dispositions

should not be considered when sentencing inmates for a violation of Rule 105.13.  Dkt.

#50, p.6.  In response, Acting Director Prack informed plaintiff that:

> The charge of 105.12 was a viable charge at that time and is
> still part of your disciplinary history.  The hearing officer may
> consider the charge in the reason for disposition. Therefore,
> the penalty imposed was appropriate.

Dkt. #50, p.8.


By letter dated October 29, 2013, plaintiff requested reconsideration of his

sentence based upon his discovery of a memo dated February 26, 2001 from Deputy

Commissioner LeClaire to Father James C. Hayes, Chief of Chaplains, advising that

"[a]ny misbehavior report dealing solely with the displaying of hand signals" such as the

sign of the Holy Trinity or Salutation of Peace commonly displayed by Rastafarian Haile

Salassie would be dismissed and that it was inappropriate to discipline inmates for

possession of photographs displaying such a symbol. Dkt. #50, pp.20 & 43-44.  Plaintiff

argued that the CHO and the CO testifying regarding gang symbols should have known

of this memo and, alternatively, the chaplain supervising Rastafarian inmates, if he had been allowed to testify, would have explained the significance of the symbol.  Dkt. #50, p.21.  Director Prack denied reconsideration by letter date November 20, 2013.  Dkt. #50, p.22.

**July 10, 2010 Misbehavior Report - Interference with CO Alvarado**

On July 10, 2010, CO Alvarado issued a misbehavior report charging plaintiff with attempted assault and physical interference with staff after plaintiff attempted to strike CO Alavarado through the feed up hatch.  Dkt. #50, p.49.  As a result of this incident, a cell shield was installed on plaintiff's cell. Dkt. #50, p.51.  Plaintiff was also subjected to a pre-hearing restricted diet order, commonly known as "the loaf."  Dkt. #50, p.53.

Plaintiff was found guilty of interference with an employee and sentenced to 90 days in SHU with loss of package, commissary, phone and personal television privileges (85 days suspended), following a disciplinary hearing conducted by Captain Kearney on July 16, 2010.  Dkt. #42-1, p.11 & Dkt. #50, p.55.    Plaintiff's appeal of this disposition was affirmed by Acting Director Prack.  Dkt. #42-1, p.11.

The cell shield order was renewed until August 10, 2010, when plaintiff filed a grievance seeking removal of his cell shield because he had been found not guilty of attempting to assault CO Alvarado. Dkt. #50, pp.59 & 64 & Dkt. #50-2, pp.16-18.

**August 15, 2010 Misbehavior Report - Assault on CO Ford**

On August 15, 2010, Sgt. Gregoire issued a misbehavior report charging plaintiff with assault on staff; failure to follow a direct order; and violent conduct.  Dkt. #55-3, p.2.  Specifically, the misbehavior report alleges that plaintiff got up from the metal detector ("Boss") chair during a post visitation frisk and grabbed hold of CO Ford's upper body, causing them to fall to the ground and fracturing CO Ford's ankle.  Dkt. #55-3, pp.2.  Plaintiff was observed by Nurse Walsh to have sustained a small abrasion to his left shoulder and middle knuckle of his left hand.  Dkt. #55-3, p.3.  Plaintiff was noted to complain of pain on the left rib area, but no abrasions or bruising were seen.  Dkt. #50, p.70.

On August 20, 2010, plaintiff complained to DSS Sticht by letter copied to, *inter alia*, the Inspector General's Office, that he had been assaulted by CO Ford and that medical providers failed to document his injuries, including a split lip, swelling to his face and lacerations on his wrists.  Dkt. #50-1, pp.4-8.

As a result of this incident, beginning August 28, 2010, plaintiff was subject to mechanical restraints whenever he was off of the unit, except when he was in the recreation pen.  Dkt. #50-2, p.2.

At the disciplinary hearing conducted by CHO Casaceli, plaintiff's defense was that CO Ford had issues with plaintiff's brother, Corey Johnson, who had been an inmate at Wende in 2001 and was visiting plaintiff. Dkt. #55-4, pp.9-10.  Plaintiff

testified that while Mr. Johnson was at the vending machine, CO Ford told Mr. Johnson that he was going to take his beef with him out on plaintiff and when plaintiff went to the bathroom, CO Ford threatened to jump plaintiff.  Dkt. #55-4, pp.10-11 & 90-91. Plaintiff testified that although his visit ended at 2:04, he was kept waiting to be escorted back to SHU until shift change at 3:00, despite policy affording SHU inmates priority and even though nearly all of the general population inmates had already  been returned to their cells. Dkt. #55-4, pp.12, 31 & 35.  Plaintiff testified that he was inside the booth waiting to be searched when CO Workman approached to search plaintiff, but Sgt. Gregoire told CO Workman to "let him go."  Dkt. #55-4, pp.12 & 117.  Plaintiff testified that, shortly thereafter, CO Ford approached plaintiff and swung at him.  Dkt. #55-4, pp.12 & 117.

Plaintiff asked to have his brother, Corey Johnson, testify as a witness. Dkt. #55-4, p.67.  CHO Casaceli denied that request because the incident occurred an hour and a half after Mr. Johnson left the facility.  Dkt. #55-4, p.67.  Plaintiff reiterated that the incident occurred because CO Ford had an issue with his brother.  Dkt. #55-4, p.68.  In support of plaintiff's motion for summary judgment, Corey Johnson submitted an affidavit stating that CO Ford approached him while he was at the vending machine and told him, "don't think it's over because you went home mother fucker."  Dkt. #61, p.18.  When Mr. Johnson challenged CO Ford to fight it out in the parking lot, CO Ford responded, "Why would I do that . . . I got your brother here with me, I'm going to fuck him up after his visit is over."  Dkt. #61, p.18.

CO Williams testified that while she and CO Ford were transporting plaintiff to the bathroom, there was a brief conversation between CO Ford and plaintiff which CO Williams "was not fully aware of."  Dkt. #55-4, p.84.  When asked if she recalled the substance of the exchange between CO Ford and inmate Davis, CO Williams testified:

> Not really, the only thing I recall on that date between Officer Ford and . . . inmate Davis which was not a verbal confrontation was something that the [sic] stated briefly through [sic] passing that he wanted to stick [sic] him.  In regards to what I do not know because I was not present at any incident between Officer Ford and Inmate Davis.

Dkt. #55-4, p.85.  CO Williams continued:

> The only thing I recall which . . . inmate Davis spoke to me personally was that he just wanted to enjoy his visit and he did not want any kind of confrontation.  Which I informed him that there was no reason for him to believe that it was any confrontation through [sic] his visitation with whoever was visiting him on that date.

Dkt. #55-4, p.85.  CO Williams was not present in the strip frisk room and had left the visiting area at approximately 3:05 p.m.  Dkt. #55-4, pp.84 & 86.

Inmate Kelly testified that while he was waiting to be searched following a visit, he overheard officers inquire, "what about this guy in the SHU? What are we going to do with him?" Dkt. #55-4, p.46.  In response, inmate Kelly heard an offer state, "We're going to hold him for last."  Dkt. #55-4, p.46.

Inmate Benning testified that he was sitting in the visiting room with approximately 15-20 other inmates waiting to be frisked at approximately 3:30 when he

observed a couple of the officers walk back toward the frisk area.  Dkt. #55-4, pp.59-60.
He did not observe an altercation.  Dkt. #55-4, p.60.

CHO Casaceli informed plaintiff that although inmates Cruz and Hynes
had informed plaintiff's hearing assistant that they would testify at the disciplinary
hearing, they had changed their minds.  Dkt. #55-4, pp.61-62.  Another witness, inmate
Drake, was on draft and unavailable.  Dkt. #55-4, p.63.

Sgt. Gregoire testified that when he, CO Workman and CO Zima went to
pick plaintiff up from his visit to return him to SHU at approximately 3:30 pm, plaintiff
was directed to sit in the Boss chair.  Dkt. #55-4, pp.17 & 19.  Plaintiff complied, but
then jumped up and grabbed CO Ford.  Dkt. #55-4, p.20.  As CO Ford attempted to
gain control of plaintiff, they fell to the ground.  Dkt. #55-4, p.20.

CO Zima testified that he and CO Workman went to the visit frisk room to
escort plaintiff back to SHU; plaintiff got out of the Boss chair and lunged at CO Ford,
causing them to fall to the floor in front of the Boss chair.  Dkt. #55-4, pp.37-38 & 40.
CO Zima gave plaintiff several direct orders to stop resisting and finally gained control
of plaintiff by grabbing his right arm and directing his wrist behind plaintiff's back so that
mechanical restraints could be applied.  Dkt. #55-4, pp.37 & 42. Sgt. Gregoire placed
the handcuffs/mechanical restraints on plaintiff.  Dkt. #55-4, p.39.

CO Vogel testified that inmate Davis sat in the Boss chair, then came off the chair and grabbed CO Ford, causing them both to fall to the ground.  Dkt. #55-4, p.74. CO Vogel grabbed control of plaintiff's left arm and the Sergeant handcuffed plaintiff. Dkt. #55-4, pp.78-79.

CO Workman recalled that plaintiff slipped off the Boss chair and grabbed CO Ford by the upper body causing them to fall to the ground with plaintiff on top of CO Ford.  Dkt. #55-4, pp.103; 09-110 & 115.   After the incident, CO Workman assisted CO Ford until he and CO Zima escorted plaintiff to the facility hospital.  Dkt. #55-4, pp.107-108 & 114.

CO Ford testified that when plaintiff entered the visit frisk area, he ordered plaintiff to sit in the Boss chair.  Dkt. #55-4, p.92.  Plaintiff complied, but "then he immediately came up off the Boss chair" and grabbed CO Ford around his upper torso, causing them to fall to the ground with plaintiff on top. Dkt. #55-4, pp.92 & 98.  When asked about his conversation with plaintiff during his visit with his brother, CO Ford recalled informing plaintiff that he knew that his brother was previously an inmate at Wende and told him to enjoy his visit.  Dkt. #55-4, p.94.  CO Ford also recalled that plaintiff yelled across the room to his brother as plaintiff was walking to the bathroom, prompting CO Ford to instruct plaintiff not to yell across the visit room floor.  Dkt. #55-4, p.94.  When plaintiff returned from the bathroom, CO Ford recalled that plaintiff stared at him, prompting CO Ford to instruct plaintiff to go back to the room and continue his visit.  Dkt. #55-4, p.94.  CO Ford agreed that he had never seen or spoken to plaintiff prior to this incident.  Dkt. #55-4, p.96.

CO Abrams was outside of the strip frisk room when the incident began, but responded to the strip frisk room while plaintiff was on the floor wrestling with CO Ford.  Dkt. #55-4, p.51.  CO Abrams did not recall any verbal exchanges between CO Ford and plaintiff earlier in the day.  Dkt. #55-4, pp.51-52.

On October 7, 2010, CHO Casaceli determined that the testimony of staff was more believable than plaintiff's testimony and found plaintiff guilty of all charges. Dkt. #55-4, p.126.  Plaintiff was sentenced to 60 months in SHU with loss of packages, commissary, and phone privileges.  Dkt. #55-3, p.47.

On December 22, 2010, DSS Venettozzi modified plaintiff's sentence to 36 months SHU with loss of packages, commissary and phone privileges. Dkt. #42-1; Dkt. #47, ¶ 63  & 50-1, p.40.

On June 5, 2011, plaintiff wrote Director Prack seeking reconsideration of the disposition on the ground that CHO Casaceli failed to make plaintiff's written complaint of excessive force a part of the hearing record.  Dkt. #50, pp.11-13.  By letter dated July 21, 2011, Director Prack denied reconsideration because plaintiff had commenced this litigation.  Dkt. #50, p.17.

**August 18, 2010 Misbehavior Report - Threatening RN Wrest**

On August 18, 2010, Nurse Wrest complained that plaintiff became angry at the medical treatment offered and became agitated and aggressive, repeatedly

stating, "I will punch you in the mother fucking face." Dkt. #50, p.75. Nurse Wrest continued her rounds, but found it difficult to hear other inmates in the cell block due to plaintiff's yelling. Dkt. #50, p.75. Security deemed plaintiff a threat and applied a cell shield, prompting plaintiff to immediately complain of chest pain. Dkt. #50, p.75. Despite his complaints, plaintiff was uncooperative with Nurse Wrest's attempt to examine plaintiff. Dkt. #50, p.75.

Plaintiff declares that the misbehavior report pertaining to the incident was dismissed and the Court notes that there is no record of this incident in plaintiff's inmate disciplinary history. Dkt. #42-1, p.11 & Dkt. #47, ¶ 62. However, Sergeant Theriault recommended, and  DSS Sticht authorized, a Cell Shield Order for plaintiff's cell from August 18, 2010 through August 24, 2010 based upon plaintiff creating a disturbance and threatening violence to medical staff. Dkt. #50-1, p.2. The cell shield order was renewed from August 24 - August 30, 2010 based upon the following rationale:

> You were recently involved in an assault on staff - You threatened medical staff with violent physical harm during doctor rounds - Your outburst and erratic behavior caused a disturbance on the company interfering with the completion of doctor [rounds] and normal operations.

Dkt. #50-1, p.57. Sergeant Theriault continued to recommend the Cell Shield Order through October 19, 2010, when plaintiff was transferred to another facility. Dkt. #50-1, pp.59-65 & Dkt. #58-5.

**September 15, 2010 Misbehavior Reports  by CO Rynkewicz**

On September 1, 2010, the Inspector General's Office interviewed plaintiff regarding his complaint of assault by CO Ford. Dkt. #49, p.6.

On September 15, 2010, plaintiff declares that CO Rynkewicz approached his cell and stated:

> I'm gonna show you how much I give a fuck about your grievances and crying to I.G - not even Obama can save you now. You're not gonna get away with breaking my partner [sic] leg and now having IG and the Captain swarming up everybody [sic] asses.  Your [sic] on the burn - don't ask for shit!

Dkt. #47, ¶ 19.  CO Rynkewicz issued a misbehavior report charging plaintiff with failure to follow a direct order; interference with staff and an unhygienic act.  Dkt. #50-1, p.10.  Plaintiff declares that it was impossible for him to spit on CO Rynkewicz because he was behind a cell shield.  Dkt. #47, ¶ 22.

Plaintiff was placed on a restricted diet beginning with lunch on September 15, 2010.  Dkt. #50-2, p.6.  Entries on the SHU Chronological Sheet pertaining to plaintiff indicate refusal of the restricted diet for the duration of the restricted diet.  Dkt. #50-2, p.6.  Plaintiff declares that he did not eat for 21 meals.  Dkt. #47, ¶ 53.

Several hours later, CO Rynkewicz issued a second misbehavior report charging plaintiff with failure to follow a direct order, interference with staff, refusing a search and unhygienic act by attempting to spit upon CO Rynkewicz as he attempted to provide plaintiff with his meal through the feed up hatch.  Dkt. #50-1, p.11.  Plaintiff declares that given the size of the feed slot, it was impossible for him to both push a bag out of the feed slot and spit through the feed slot.  Dkt. #47, ¶ 25.

On September 29, 2010, CHO Furlani found plaintiff guilty of all charges *in absentia* and sentenced him to 8 months SHU.  Dkt. #50-1, p.23.

By letter addressed to Director Prack dated October 25, 2010, plaintiff complained that he did not refuse to participate in his disciplinary hearing on September 29, 2010, but was scheduled for hospital call out.  Dkt. #50-1, p.45.  Plaintiff also complained that the CHO failed to call any of the witnesses he had requested to testify on his behalf and failed to document any basis for failing to call his witnesses.  Dkt. #50-1, p.47.

On January 14, 2011, Director Prack reversed the dispositions regarding the September 15, 2010 misbehavior reports. Dkt. #50-1, p.43.

**September 17, 2010 Recreation Pen Incident**

CO Rynkewicz issued a misbehavior report charging plaintiff with threats and harassment while escorting plaintiff to the recreation pen.  Dkt. #50-1, p.18.

Plaintiff declares that he was the last inmate to be returned from recreation, even though he was the fourth inmate out.  Dkt. #47, ¶ 27.  According to plaintiff, CO Rynkewicz put a retention strap[2] on his handcuffs as he approached plaintiff's cell and ordered plaintiff to turn around and put his hands outside the hatch.

_____

[2] A retention strap is a length of nylon webbing that is secured to the center of a pair of handcuffs so that an inmate being handcuffed through an opening in a cell door cannot pull the handcuffs into the cell.  Dkt. #42, ¶ 26.

Dkt. #47, ¶¶ 28-29.  CO Rynkewicz locked one cuff around plaintiff's left wrist and then fell to the ground, pulling the strap as hard as he could and causing plaintiff excruciating pain.  Dkt. #47, ¶ 30.  Sergeant Theriault intervened, but after cuffing plaintiff's right wrist, CO Rynkewicz again pulled the strap down on plaintiff's wrists as they hung backwards out of the hatch.  Dkt. #47, ¶ 33.  Once the recreation pen was opened, plaintiff declares that CO Rynkewicz grabbed plaintiff's hair and slammed him to the ground, pulling his arms up behind his back.  Dkt. #47, ¶ 34.  After Sergeant Theriault intervened, CO Rynkewicz slammed him to the ground a second time, pushing his head into the concrete.  Dkt. #47, ¶ 35.

Medical examination revealed a dime sized superficial abrasion on plaintiff's left shoulder and a half inch superficial abrasion to plaintiff's right temple.  Dkt. #42-8. Plaintiff declares that his injuries were not properly documented and that he continues to suffer back pain and pain from a torn ligament to his wrist which has been treated with ibuprofen, muscle relaxants and physical therapy.  Dkt. #47, ¶¶ 36-39 & 66-67 & Dkt. #49, p.10 & Dkt. #50-1, pp.68-75.

CO Rynkewicz issued a second misbehavior report charging plaintiff with threats, interference with staff, refusing a direct order, violent conduct and unhygenic act.  Dkt. #50, p.19.  Specifically, CO Rynkewicz alleged that:

> At approximately 10:40 am, inmate Davis . . . refused a direct order to be handcuffed and exit the SHU recreation pen.  A second attempt was made to bring [plaintiff] in. He verbally agreed.  I cuffed his left hand.  Davis then pulled his right hand into the pen and attempted to take the handcuffs from me.  I fell to the ground while struggling for control.

>Once compliance was gained, Davis was cuffed and
>escorted back inside.  While walking in Davis attempted to
>turn and spit at me several times.  Davis had to be taken to
>the ground to maintain control.  Compliance was
>reestablished and Davis again pulled away and attempted to
>spit at me until he was secured in the strip cell.

Dkt. #42-7.  Sergeant Theriault co-signed the misbehavior report as a witness and authored a Use of Force Report. Dkt. #42-7  & Dkt. #58-2.

In a declaration in support of the instant motion, Sergeant Theriault states that, as a Corrections Sergeant, he was authorized to use a retention strap on an inmate without authorization form his superiors when deemed necessary.  Dkt. #58, ¶ 2. Sergeant Theriault declares that he authorized the use of the retention strap on plaintiff because plaintiff initially refused CO Rynkewicz's order to submit to the mechanical restraints and exit the SHU recreation pen to be escorted back to his cell.  Dkt. #58, ¶ 2. Once the mechanical restraints were applied, Sergeant Theriault declares that plaintiff attempted to pull the handcuffs back into the recreation pen and then threatened and attempted to spit upon the escorting officers.  Dkt. #58, ¶¶ 2-3.

Sergeant Theriault authored a memorandum to DSS Sticht recommending the use of a retention strap for all future escorts of plaintiff.  Dkt. #58, ¶ 7.  Captain Casaceli authorized use of a retention strap until further notice.  Dkt. #50-1, p.77 & 50-2, p.12.  Sergeant Theriault also included plaintiff's involvement in this use of force incident as further justification for renewal of the mechanical restraint order.  Dkt. #50-2, p.2.

In accordance with 7 NYCRR 305.2, on September 18, 2010, Sergeant Theriault also recommended issuance of a deprivation order denying plaintiff recreation based upon plaintiff's refusal to follow orders and attempt to gain control of mechanical restraints on September 17, 2010.  Dkt. #42-9 & 50-2, p.4.  On September 22, 2010, plaintiff complained to DSS Sticht that Captain Casaceli's denial of recreation for an indefinite period of time was a violation of his constitutional rights.  Dkt. #50, p.25.  On October 13, 2010, plaintiff complained to DSS Sticht that he was being denied all opportunity for exercise as a result of Captain Casaceli's deprivation order of September 18, 2010.  Dkt. #50, p.24.

On September 30, 2010, CHO Furlani found plaintiff guilty of all charges *in absentia* and sentenced him to sixteen months in SHU.  Dkt. #50-1, p.26.

By letter addressed to Director Prack dated October 26, 2010, plaintiff complained that he did not refuse to attend his hearing, but simply requested an escort officer other than CO Rynkewicz and that CHO Furlani failed to hear any evidence before finding plaintiff guilty of all charges contained in the misbehavior report.  Dkt. #50-1, pp.51-55.

On January 14, 2011, Director Prack reversed the dispositions. Dkt. #50-1, p.50.

**September 23, 2010 Misbehavior Report - CO Rynkewicz**

On September 23, 2010, CO Rynkewicz issued a misbehavior report charging plaintiff with threats, violent conduct and harassment. Dkt. #50, p.21. CHO Blake found plaintiff guilty of violent conduct and sentenced plaintiff to 30 days SHU with loss of recreation, package, commissary, phone and personal television privileges. Dkt. #42-1, p.12, Dkt. #47, ¶¶ 60-61 & Dkt. #50-1, p.37.

**September 28, 2010 Inspector General Complaint**

On September 28, 2010, plaintiff authored a ten page memorandum to the Deputy Superintendent for Security, Inspector General, Attorney General's Office, Commissioner, Prisoner's Legal Service and Legal Aid Society complaining of employee misconduct following the incident with CO Ford. Dkt. #42-10. Specifically, plaintiff complained that CO Rynkewicz filed a false misbehavior report against him on September 15, 2010, resulting in plaintiff being placed on a restricted diet (the loaf), for seven days and that CO Rynkewicz assaulted him and filed a false misbehavior report against him on September 17, 2010. Dkt. #42-10. Plaintiff also complained that Sergeant Theriault and Captain Casaceli failed to address his complaints of harassment and threats. Dkt. #42-10.

**October 2, 2010 Grievance re: Visitation**

On October 2, 2010, plaintiff filed an Inmate Grievance Complaint regarding the denial of contact visitation. Dkt. #50-2, p.20. Specifically, plaintiff argued that his visitation privileges should not be affected by conduct that occurred after visitation and was not in violation of regulations pertaining to his contact with visitors.

Dkt. #50-2, p.20.  The Inmate Grievance Committee deadlocked as to whether plaintiff

should be penalized for conduct which occurred after visiting hours.  Dkt. #50, p.21.

**October 10, 2010 Misbehavior Report - CO Rynkewicz**

On October 10, 2010, CO Rynkewicz issued a misbehavior report

charigng plaintiff with threats, harassment and an unhygenic act.  Dkt. #50-1, p.35.

CHO Blake found plaintiff guilty of violent conduct and sentenced plaintiff to 30 days

SHU.  Dkt. #49, p. 8.  The disposition was dismissed on October 18, 2010.  Dkt. #47, ¶

62 & Dkt. #49, p.9.

**October 10, 2010 Inspector General Complaint**

On October 10, 2010, plaintiff authored a three page memorandum to

DSS Sticht, copied to the Inspector General's Office and Prisoners Legal Service,

complaining of ongoing harassment by CO Rynkewicz.  Dkt. #42-11.

**October 12, 2010 Inspector General Complaint**

On October 12, 2010, plaintiff authored a five page memorandum to DSS

Sticht, copied to the Inspector General's Office, complaining of employee misconduct

and harassment by CO Rynkewicz.  Dkt. #42-12.  Specifically, plaintiff complained that

CO Rynkewicz had written six false misbehavior reports against him between

September 15, 2010 and October 10, 2010 in retaliation for plaintiff's complaints

against CO Rynkewicz and the incident on August 15, 2010.  Dkt. #42-10.  Plaintiff

complained that he had been assaulted, subjected to a restricted diet and denied

recreation.  Dkt. #42-12.

## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise."  *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party

seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


**Denial of Due Process**

> The Fourteenth Amendment to the Constitution provides that
> "[n]o State shall . . . deprive any person of life, liberty, or
> property, without due process of law."  U.S. Const. amend.
> XIV, § 1.  Although prison inmates necessarily have their
> liberty severely curtailed while incarcerated, they are
> nevertheless entitled to certain procedural protections when
> disciplinary actions subject them to further liberty
> deprivations such as loss of good-time credit or special
> confinement that imposes an atypical hardship.

*Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).  For example,

> an inmate is entitled to advance written notice of the charges
> against him; a hearing affording him a reasonable
> opportunity to call witnesses and present documentary
> evidence; a fair and impartial hearing officer; and a written
> statement of the disposition, including the evidence relied
> upon and the reasons for the disciplinary action taken.

*Id., citing Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974). More specifically, in *Wolff v.*

*McDonnell*, the Supreme Court of the United States determined that an

> inmate facing disciplinary proceedings should be allowed to
> call witnesses and present documentary evidence in his
> defense when permitting him to do so will not be unduly
> hazardous to institutional safety or correctional goals.

418 U.S. at 566.  In reaching this conclusion, the Court recognized that

> Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*Id.* In exercising that discretion, prison officials must be able to

> explain, in a limited manner, the reason why witnesses were not allowed to testify, . . . either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing.  In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it "later."

*Ponte v. Real*, 471 U.S. 491, 497 (1985).  A hearing officer may rationally exclude witnesses or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing.  *Kalwasinski*, 201 F.3d at 109. The burden is on the prison official to demonstrate "the rationality of his position."  *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).  In reviewing disciplinary decisions, the Supreme Court has made clear that

> The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board.  Instead, due process in this context requires only that there be some evidence to support the findings made in the disciplinary hearing.

*Superintendent v. Hill*, 472 U.S. 445, 457 (1985).

<u>January 28, 2010 Misbehavior Report</u>

Plaintiff argues that he was prejudiced by CHO Furlani's refusal to allow nearby inmates or his assistant to testify as to statements made by inmates in cells

near plaintiff's as to plaintiff's behavior during the cell search.  Dkt. #46, p.22 & Dkt. #61, pp.4-5.  Plaintiff also argues that he had a right to call his assistant to testify regarding her investigation into the officers present during the cell search given that CHO Furlani informed plaintiff that CO Grosekowsky did not exist.  Dkt. #46, p.22 & Dkt. #61, p.5.  Plaintiff challenges the denial of CO Littles as a witness, arguing that neither his on the job training status nor his absence from Wende should shield the author of a misbehavior report from testifying.  Dkt. #46, p.21 & Dkt. #61, p.6.  Finally, plaintiff argues that Deacon Steinagle should have possessed the memo stating that the Rastafarian hand sign should not be mistaken as a gang sign.  Dkt. #46, p.20 & Dkt. #61, p.7.  Alternatively, plaintiff argues that the Rastafarian inmate should have been allowed to testify as to the meaning of the hand sign.  Dkt. #61, p.7.

Contrary to plaintiff's argument, CHO Furlani informed plaintiff that he would call the inmate witnesses interviewed by plaintiff's hearing assistant, but plaintiff demanded testimony from the hearing assistant instead. Dkt. #55-2, pp.5 & 40. Moreover, plaintiff did not ask for his hearing assistant to testify as to her efforts to identify other corrections officers searching in the vicinity of plaintiff's cell.  In any event, CHO Furlani determined that CO Kyle was conducting a search near plaintiff's cell and called him to testify.  Dkt. #55-2, p.7. CHO Furlani also offered to call CO Moran, who was also conducting cell searches on the company, but plaintiff declined to call him. Dkt. #55-2, pp.11 & 29.

CHO Furlani's denial of plaintiff's request for CO Littles as a witness was justified based upon the fact that CO Littles was no longer working at Wende at the time of the hearing and was working under the direct supervision of the co-author of the misbehavior report, CO Ferron, who did testify.  In any event, plaintiff proffers no prejudice arising from the absence of CO Littles as a witness.  *See Randolph v. Simmons*, 757 F. Supp.2d 233, 236 (W.D.N.Y. 2010) ("to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing.").

Finally, the Court finds that, even crediting plaintiff's assertion that the gesture displayed within the photograph is a Rastafarian religious symbol, there was ample evidence for the CHO to find plaintiff guilty of gang activity.  As CHO Furlani noted in his statement of reasons for disposition, the written letters found in plaintiff's cell clearly indicate plaintiff's involvement in gang activity.

As plaintiff was not deprived of his federal constitutional right to due process during the course of the disciplinary hearing, Director Prack's denial of plaintiff's request for reconsideration of that determination cannot establish a federal constitutional violation.  *See Hameed v. Mann*, 57 F.3d 217, 224 (2d Cir. 1995) (Director of Special Housing and Inmate Grievance Programs entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing). As a result, plaintiff's denial of due process claim against CHO Furlani and Director Prack regarding the January 28, 2010 misbehavior report is dismissed.

August 15, 2010 Misbehavior Report

Plaintiff argues that plaintiff's brother, Corey Johnson, would have testified that he and CO Ford had prior issues and that CO Ford informed Mr. Johnson that he was going to assault plaintiff to get back at Mr. Johnson, thereby corroborating plaintiff's claim that CO Ford initiated the incident.  Dkt. #46, p.26 & Dkt. #61, p.8.  Plaintiff reiterates his arguments at his disciplinary hearing that he had never seen CO Ford prior to this incident and had no reason to attack him and that it was physically impossible for plaintiff to have attacked CO Ford as alleged because there was an officer to the left and an officer to the right of the chair he was sitting in.  Dkt. #61, p.9.

CHO Casaceli denied testimony from plaintiff's brother, Corey Johnson, because the incident occurred an hour and a half after plaintiff's brother left the facility. This is a rational basis for the denial of the witness.  *See Murray v. Arquitt*, 10-CV-1440, 2014 WL 4676569, at *15 (N.D.N.Y. Sept. 18, 2014) (denial of witnesses who did not observe what transpired during use of force would not assist CHO in arriving at a decision regarding misbehavior reports).  Accordingly, plaintiff's denial of due process claim against CHO Casaceli is dismissed.

September 15, 2010 & September 17, 2010 Misbehavior Reports

CHO Furlani argues that plaintiff cannot demonstrate a protected liberty interest with respect to these misbehavior reports because his convictions were reversed before the sanctions imposed by CHO Furlani were served.  Dkt. #59, pp.7-8.

Plaintiff claims that as a result of the findings of guilt, he was continued on a restricted diet, lost contact visitation and recreation, was placed in full mechanical restraints and continued to be subjected to the cell shield until October 19, 2010.  Dkt. #61, p.13.

To state a cognizable section 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process.  *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313, 316 (2d Cir. 1996).  "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004), *quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995).  In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id., quoting Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

In the instant case, plaintiff cannot pursue his denial of due process claims with respect to the disciplinary hearings conducted by CHO Furlani regarding the September 15, 2010 and September 17, 2010 misbehavior reports because the dispositions were reversed on appeal before plaintiff completed his sentence on the

January 28, 2010 misbehavior report  and before he started his sentence on the August 15, 2010 misbehavior report.  *See Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir. 1992), *cert. denied*, 510 U.S. 837 (1993) (plaintiff suffered no interference with a liberty interest where disciplinary disposition was vacated before he served a day of the penalty imposed).  Moreover, the restricted diet, loss of contact visitation and recreation, use of a cell shield and application of  mechanical restraints and a retention strap were not penalties imposed by the disciplinary process but were consequences of the allegedly false misbehavior reports issued by CO Rynkewicz, a claim which is addressed *supra*.  Accordingly, plaintiff's denial of due process claims against CHO Furlani are dismissed.

**Retaliation**

Plaintiff seeks summary judgment on his claim that CO Rynkewicz filed six misbehavior reports against him in retaliation for plaintiff complaining to the Inspector General that CO Ford assaulted him on August 15, 2010 and that CO Rynkewicz threatened and assaulted plaintiff.  Dkt. #46, pp.11 & 13-17.  Although 19 of the 20 charges lodged against him by CO Rynkewicz during this 30 day period were dismissed or reversed on administrative appeal before plaintiff began to serve any sentence imposed by the disciplinary process, plaintiff complains that these charges caused him to suffer behind a cell shield during the heat of summer; be subjected to a restricted diet; placed on full restraints with a retention strap; and denied recreation and contact visitation.  Dkt. #46, pp.11 & 13-15.

A plaintiff alleging retaliatory punishment "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996); *See Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (To sustain a First Amendment retaliation claim, a prisoner must demonstrate that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the prisoner; and (3) there was a causal connection between the protected speech and the adverse action).

Although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," the issuance of a false misbehavior report in retaliation for exercising a constitutional right is actionable under Title 42, United States Code, Section 1983. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."); *Smith v. Greene*, No. 9:06-CV-505, 2008 WL 794978, at *4 (N.D.N.Y. March 24, 2008) ("There is no dispute that [plaintiff's] complaint to the Inspector General's office was protected activity.").

In the prison context, adverse action is objectively defined as conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional

protection." *Id., quoting Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse. *Id.*

To prove that retaliation was the motivating factor behind the adverse action, the plaintiff must present facts supporting an inference of a causal connection between the adverse actions and the protected conduct. *Id.* at 492. In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *See Colon*, 58 F.3d at 872. Because prisoner retaliation claims are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, the Court of Appeals has held that temporal proximity between protected conduct and an adverse action is insufficient to permit a prisoner to proceed to trial on a retaliation claim; some further evidence of retaliatory animus, such as evidence creating doubt as to the accuracy of the accusations set forth in the misbehavior report or administrative reversal of the disciplinary hearing resulting from the misbehavior report, is required. *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002).

In the instant case, plaintiff's August 20, 2010 complaint to the Inspector General alleging that CO Ford attacked plaintiff constitutes protected activity. Moreover, CO Rynkewicz's issuance of six misbehavior reports within one month of plaintiff's complaint to the Inspector General, combined with the dismissal or reversal on administrative appeal of the findings of guilt on all but one of those charges, is sufficient to create a triable issue of fact as to the causal relationship between the protected conduct and the alleged retaliation.

The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. *Id.* at 80. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.) (per curiam), *cert. denied*, 525 U.S. 907 (1998); *see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994) (holding that the defendants met their burden when "it was undisputed that [the plaintiff] had in fact committed the prohibited conduct").

In the instant case, there are genuine issues of material fact to be resolved by a jury as to whether plaintiff engaged in the conduct alleged and, even if he is determined not to have engaged in the conduct charged, whether the punishment plaintiff claims to have suffered would have been imposed upon plaintiff in any event. For example, although CO Rynkewicz's charges of unhygienic acts by plaintiff were added to the rationale supporting continuation of the cell shield order, the cell shield

was imposed following Nurse Wrest's complaints that plaintiff threatened her during medical rounds and may well have justified continuation of the cell shield regardless of CO Rynkewicz's charges.  Accordingly, plaintiff's motion for summary judgement on his claim of retaliation is denied.

**Use of Excessive Force**

Plaintiff's motion for summary judgment on his cause of action alleging that CO Rynkewicz assaulted him on September 17, 2010 (Dkt. #46, pp.35-39), is denied as there are clearly questions of fact as to whether CO Rynkewicz acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillan*, 503 U.S. 1, 7 (1992).

**Authorization of Retention Strap**

Plaintiff argues that Sergeant Theriault did not have authority to utilize a retention strap on plaintiff on September 17, 2010 as he did not request authorization from DSS Sticht to use a retention strap upon plaintiff until after the incident in the recreation pen.  Dkt. #46, pp.39-40.  In support of this argument, plaintiff relies upon Sergeant Theriault's response to plaintiff's interrogatory inquiring as to the procedure that must be followed before an inmate is placed on the retention strap: "Request authorization from the Deputy Superintendent of Security, Thomas Sticht, who either approves or denies the order."  Dkt. #30, pp.4-5 & Dkt. #46, p.39.

Even assuming that Sergeant Theriault failed to follow appropriate procedures regarding authorization of use of a retention strap, a violation of prison regulations does not amount to a constitutional violation and is no a valid basis for relief in an action pursuant to 42 U.S.C. § 1983.  *Cico v. Kourofsky*, 9:08-CV-491, 2010 WL 5138549, at *4 (N.D.N.Y. Feb. 18, 2010); *Lopez v. Reynolds*, 998 F. Supp. 252, 259 (W.D.N.Y. 1997) ("A prison inmate does not have a viable § 1983 claim based solely on prison officials' failure to adhere to the requirements of prison regulations, directives or policy statements.").  Accordingly, plaintiff's claim against Sergeant Theriault for authorization of the retention strap is dismissed.

**Exhaustion of Administrative Remedies**

Defendants argue that plaintiff failed to properly exhaust his claim regarding the denial of exercise, as well as his complaints regarding the imposition of a cell shield, application of mechanical restraints and retention strap, denial of meals and loss of contact visits.  Dkt. #59, p.8.

Plaintiff argues that he exhausted his administrative remedies by complaining to DSS Sticht.  Dkt. #61, p.15.

The Prison Litigation Reform Act ("PLRA"), states:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). In *Porter v. Nussle*, 534 U.S. 516 (2002), the Supreme Court held that exhaustion of

administrative remedies in 1997(e) cases is mandatory[3] and should be applied broadly. *Id.* at 524.  The *Nussle* Court reasoned that requiring inmates to follow the grievance process would ultimately "reduce the quantity and improve the quality of prisoner suits;" filter out frivolous claims; and for those cases that eventually come to court, the administrative record could potentially clarify the legal issues.  *Id.* at 524-25.  "Even when the prisoner seeks relief not available in grievance proceedings" – such as monetary damages – "exhaustion is a prerequisite to suit."  *Id.* at 524, *citing Booth v. Churner*, 532 U.S. 731, 741 (2001).  Thus, the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Id.* at 532.

The New York State Department of Correctional Services employs a three-step Inmate Grievance Program that requires an inmate to: (1) file a grievance with the Inmate Grievance Review Committee as set forth in 7 N.Y.C.R.R. § 701.5(a); (2) appeal to the superintendent within four working days of receiving the Inmate Grievance Resolution Committee's adverse written response as set forth in 7 N.Y.C.R.R. § 701.7(b); and appeal to the Central Office Review Committee ("CORC"), in Albany, New York within four working days of receipt of the superintendent's adverse written response, as set forth in 7 N.Y.C.R.R. § 701.7(c)(1).  *Abney v. McGinnis*, 380 F.3d 663  (2d Cir. 2004).

---

[3] Although mandatory, administrative exhaustion is an affirmative defense rather than a jurisdictional predicate. *Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003); *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999).

In assessing what constitutes exhaustion of administrative remedies, the

Court of Appeals for the Second Circuit determined that

> a three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a).  Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner.  *Abney v. McGinnis*, 380 F.3d 663 . . . .  The Court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman*, 380 F.3d 691 . . ., or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba*,[4] 366 F.3d at 163.  If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord*, 380 F.3d 670. . . .

*Hemphill v. New York,* 380 F.3d 680, 686  (2d Cir. 2004).


Although plaintiff successfully grieved the cell shield order imposed on

July 10, 2010, plaintiff never filed a grievance regarding the cell shield order imposed

on August 18, 2010 and does not proffer an explanation to excuse his failure to file an

inmate grievance.  Similarly, plaintiff never grieved the application of the mechanical

restraints or the retention strap or imposition of a restricted diet.  Although plaintiff filed

a grievance with respect to the denial of contact visitation, plaintiff does not dispute that

---

[4] *Ziemba v. Wezner*, 366 F.3d 161 (2d Cir. 2004).

he failed to appeal the Inmate Grievance Committee's determination to CORC.

Furthermore, plaintiff's letters to DSS Sticht complaining about the restricted diet and

deprivation of recreation are insufficient to satisfy the PLRA's exhaustion requirement.

See *Heyliger v. Gebler,* No. 06-CV-6220, 2014 WL 4923140, at *4 (W.D.N.Y. Sept. 30,

2014), *citing Muhammad v. Pico*, No. 02 Civ. 1052, 2003 WL 21792158, at *8 (S.D.N.Y.

Aug. 5, 2003) (collecting cases holding that letters of complaint to Commissioner or

Facility Superintendent do not satisfy the PLRA's exhaustion requirements).  Thus, to

the extent that such complaints could be construed as independent Eighth Amendment

claims, plaintiff failed to properly exhaust his administrative remedies with respect to

such claims.


## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary

judgment (Dkt. #41), is granted in part and plaintiff's motion for summary judgment (Dkt.

#46), is denied.


The Clerk of the Court is directed to terminate Captain Casaceli, Sergeant

Theriault, Education Supervisor Furlani, and Director Prack as defendants in this action.


The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any

appeal from this Order would not be taken in good faith, and leave to appeal to the

Court of Appeals as a poor person is denied.  *Coppedge v. United States*, 369 U.S. 438

(1962).  Further requests to proceed on appeal as a poor person should be directed, on

motion, to the United States Court of Appeals for the Second Circuit, in accordance with

Rule 24 of the Federal Rules of Appellate Procedure.


    **SO ORDERED.**

DATED:    Buffalo, New York
          March  10, 2015


              /s H. Kenneth Schroeder, Jr.
              **H. KENNETH SCHROEDER, JR.**
              **United States Magistrate Judge**